**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Atlantis 2000 Group, Inc.,** | ) | **CASE NO. 1: 11 CV 58** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **The MetroHealth System,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

This contract dispute is before the Court upon Defendant's Motion for Summary Judgment (Doc. 16). For the reasons stated below, the motion is denied.

**Facts**

Only the following background facts have been provided to the Court in connection with the pending motion. Defendant MetroHealth System (MetroHealth) is a county hospital organized and operated under Chapter 339 of the Ohio Revised Code. On May 26, 2010, MetroHealth's Board of Trustees adopted Resolution 16015, which provides:

WHEREAS, the Board of Trustees of The MetroHealth System has been

1

> presented a recommendation for the retention of experienced intangible and personal property brokers through competitive bidding or a statutory equivalent; and
>
> WHEREAS, the Board's Finance Committee has reviewed this recommendation and now recommends its approval.
>
> NOW, THEREFORE BE IT RESOLVED, The Board of Trustees of the MetroHealth System hereby approves the retention of experienced intangible and personal property brokers through competitive bidding or a statutory equivalent, for confidential solicitation of purchase proposals for certain surplus intangible and other personal property of the System. The retained broker may use any commercially reasonable and confidential method to solicit purchase proposals. Any final sale will be subject to the approval of the System. All brokerage fees and expenses are to be paid out of either the proceeds of any final sale or general operating funds.
>
> BE IT FURTHER RESOLVED, The Chief Executive Officer and President or designee are hereby authorized to negotiate and execute agreements and other documents consistent with this resolution.

(Def. Mot., Ex. A.)

Pursuant to Resolution 16015, on or about July 13, 2010, MetroHealth entered into a Sales Management Agreement with Plaintiff Atlantis 2000 Group, Inc. (Atlantis) for the promotion and sale of a Eurocopter EC145 Helicopter owned by MetroHealth. The Sales Management Agreement provides in relevant part:

> Atlantis agrees to undertake a professional promotional effort directed toward the sale of MetroHealth's Helicopter. Atlantis's marketing and sales specialists will provide exposure through circulation of information and details regarding the Helicopter to its international network of contacts, directly to owners and operators of TRADE-UP aircraft, or helicopters and other advertising methods as Atlantis deems desirable. Atlantis shall pay the costs of all such marketing and advertising activities. In consideration of the above undertaking by Atlantis, MetroHealth agrees that Atlantis shall have the exclusive right to manage the sale, trade and/or lease of the Helicopter for a period of up to 6 (six) months.
>
> MetroHealth agrees to Atlantis initially listing the aircraft for sale at an asking price of US $6,500,000 (six million five hundred thousand dollars).

>MetroHealth agrees that if it receives this price or, in the event it later authorizes a sale at less than that amount authorized above, Atlantis shall receive a commission of $150,000.00 (one hundred fifty thousand dollars) in cash from the closing escrow funds.

The Sales Management Agreement was executed on behalf of MetroHealth by its Chief Financial Officer Sharon Daugherty, and on behalf of Atlantis by Atlantis's President Steve Varsano.

Atlantis alleges that it complied in good faith with its obligations under the Sales Management Agreement and that "an offer of $6,000,000 (six million dollars) for the purchase of the aforedescribed Helicopter was obtained." (Complt., ¶ 7.)[1]

Atlantis contends MetroHealth "authorized" the sale of the helicopter for $6 million and breached the Sales Management Agreement by failing and/or refusing to pay Atlantis a commission as called for in the Sales Management Agreement. (Complt., ¶ 8). Atlantis seeks damages from MetroHealth for this alleged breach. In addition, Atlantis alleges the following claims against MetroHealth "concurrently and/or in the alternative:" a claim against MetroHealth on the theories of *quantum meruit* and/or *quantum valabant* in that Atlantis "devoted substantial effort and incurred significant costs in furtherance of the promotion and sale of [MetroHealth's] helicopter (Complt., ¶ 9); a claim in equity against MetroHealth in that Atlantis "relied to its financial damage and detriment upon [MetroHealth's] promises and commitments with respect to the promotion and sale of [MetroHealth's] Helicopter" (Complt., ¶ 10); and a claim that Atlantis relied to its detriment on false representations by MetroHealth that it would sell its helicopter for $6 million. (Complt., ¶ 11.)

---

[1] There is no dispute that a $6.5 million offer was not obtained.

MetroHealth denies that it approved a sale for $6 million and moves for summary judgment on all of Atlantis's alleged claims.

**Standard of Review**

Federal Rule of Civil Procedure 56 governs summary judgment and provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to "materials in the record," including depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1986). In order to defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its position. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). In determining a motion for summary judgment, the non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255.

4

**Analysis**

MetroHealth contends that it cannot be liable on Atlantis's claims as a matter of Ohio law because MetroHealth's Board of Trustees never approved the $6 million offer through an appropriate board resolution.[2]

MetroHealth contends a board resolution is required by virtue of Ohio Revised Code §339.06(C), which provides: "The board of county hospital trustees has control of the property of the county hospital, including management and disposal of surplus property other than real estate or an interest in real estate." MetroHealth contends Ohio Rev. Code §339.06(C)'s vesting of control of hospital property with the Board of Trustees requires that the Board approve the sale of hospital property. A Board resolution is required because the Board of Trustees can only act through resolution.

MetroHealth acknowledges that the Board of Trustees issued Resolution 16015, which authorized the retention of Atlantis for the solicitation of purchase proposals for the helicopter. However, MetroHealth argues that the Board did not delegate its authority to approve a sale in this resolution. To the contrary, MetroHealth argues the statement in the resolution that "[a]ny final sale will be subject to the approval of the System" means that the Board of Trustees must approve any final sale; the term "the System" as used in this provision refers to the Board of Trustees.

In support of its position that it is entitled to summary judgment as a matter of law, MetroHealth relies on cases supporting the proposition that contracts entered into with

---

[2] There is no dispute that Resolution 16015 is the only applicable resolution issued by MetroHealth's Board of Trustees. It is undisputed that the Board of Trustees did not issue a separate resolution approving a $6 million sale.

5

governmental entities must comply with legislative requirements pertaining to such contracts. Contracts that do not comply with legislative requirements are null and void.  *See* MetroHealth Br. at 9-14.

For example, in *Shampton v. City of Springboro*, 98 Ohio St.3d 457, 786 N.E.2d 883 (Ohio 2003), a city charter gave the city manager the power to prepare, arrange, and sign contracts, but stated that no contracts shall be legal until ratified or authorized by city council resolution.  The city manager sought to negotiate a long term lease with a lessee of city-owned restaurant facilities, but the city manager and the lessee could not agree to terms for a long term agreement in a timely fashion.  Therefore, the city manager asked for and obtained a city council resolution allowing him to enter into a temporary lease agreement with the lessee pending negotiation of a long term lease.  Resolution R-95-32 "authorized [the city manager] to enter into a temporary lease agreement with the [lessee]" while proceeding as expeditiously as possible "toward the completion of negotiations for a long-term lease agreement." *Shampton*, 98 Ohio St.3d at 459.  A temporary lease was executed which provided either party the ability to terminate on 30 days notice and stated that the parties specifically intended the lease agreement to continue in effect only until a long term lease containing more detailed terms and conditions could be negotiated and executed.  In anticipation of a long term lease, the lessee closed a restaurant he had been operating elsewhere and made substantial financial investments in the city's facility.  However, during the negotiations for a long term lease, a dispute arose as to who would be responsible for paying property taxes.  When the lessee demanded that the city pay the taxes, the city manager notified the lessee that the city was terminating the temporary lease and would not

6

enter into a long term lease. The lessee sued the city alleging breach of contract and promissory estoppel.

The Ohio Supreme Court held that the lessee's claims failed as matter of law. The court held that even if a long term agreement had been reached between the city manager and the lessee, such an agreement would be invalid under Ohio law because Resolution R-95-32 did not grant the city manager the authority to enter into a long term lease. Rather, the city charter provided that final contracts are not legal until ratified by city council. The Ohio Supreme Court also held that the lessee's promissory estoppel claim was insufficient as a matter of law because the lessee could not have reasonably relied on representations made by the city manager in light of the city charter's requirement that city council approve or ratify all contracts. The Ohio Supreme Court stated:

> Persons seeking to enter into a contractual relationship with a governmental entity are on constructive notice of the statutory limitations on the power of the entity's agent to contract. Since the state and local laws are readily available for public review, it is a simple matter for a party to educate itself as to the procedural formalities with government officials must comply before they may bind a governmental entity to a contract. Here, as noted previously, the charter and Resolution No. R-95-32 clearly did not grant [the city manager] the authority to enter into a long-term lease. As a result, even if the [city manager] did make any promises regarding the long-term lease, appellees could not have reasonably relied upon them. Liability does not attach to the city based on appellees' mistaken interpretation of the resolution.

*Shampton*, 98 Ohio St.3d at 461-62.

MetroHealth's position here is that "there was no agreement to sell a helicopter at all" because Board of Trustees' approval is required as a matter of Ohio statutory law in Ohio Rev. Code § 339.06(C) and Resolution 16015, and there is no board resolution approving the $6 million offer. For the same reason, MetroHealth contends Atlantis's claims based on

7

detrimental reliance and equitable considerations are also legally ineffective as a matter of law.

Atlantis disputes MetroHealth's position that Ohio Rev. Code § 339.06(C) "mandate[s] that the final disposition of the property must be approved by a vote of the members of the Board." Altantis contends that while Ohio Rev. Code § 339.06(C) "grants discretion to the Board of a county hospital with regard to management and disposal of 'property,'" the statute does not prescribe the manner in which the Board's discretion should be exercised. Atlantis maintains that MetroHealth "cannot simply infer that where the Legislature statutor[il]y vests 'control' in a particular body or entity that it automatically follow[s] therefrom that 'control' may not be delegated or that any final action is vested in the entity or body." (Opp. at 3.)

Further, Atlantis contends the hospital's Board of Trustees delegated the authority to effectuate a sale of the helicopter in Resolution 16015. Contrary to MetroHealth's position that Resolution 16015 is clear and requires a board resolution to approve a final sale, Atlantis contends the meaning of the statement in Resolution 16015 that "[a]ny final sale will be subject to the approval of the System" is at a minimum ambiguous and that discovery is required to determine the proper meaning of "the System." Atlantis maintains that discovery will "likely" reveal that the Board of Trustees delegated authority to approve the sale of the helicopter to MetroHealth's officers. (Opp. at 6-8.) In particular, Atlantis argues the parties' dealings establish that MetroHealth's CFO Sharon Daugherty was "the individual to whom authority to consummate the sale of the helicopter was delegated." Atlantis contends email correspondence between Varsano and MetroHealth's Treasurer Jeff Kerkay demonstrates that

8

Daugherty approved a $6 million sale.  (*See* Opp. at 9-11.)[3]

MetroHealth disputes Atlantis's contentions that the parties' course of dealings establish Sharon Daugherty as the officer authorized to approve a sale and that email exchanges between Varsano and Kerkay demonstrate that Daugherty agreed to a $6 million sale.[4]  However, MetroHealth reasserts its position in its reply brief that it is entitled to summary judgment on the basis that MetroHealth's Board of Trustees did not approve a $6 million sale through resolution as required by Ohio statutory law.  (*See* Rep. at 1-2.)

---

[3]

Atlantis relies primarily on the following email exchanges from Kerkay to Varsano on September 9, 2010:

> So a fair market floor price would be $5,700k + $300- 400k - $100k = $5.9-6.0 million?  We'll talk to Sharon about this, but my feeling is that maybe we go back with $6 million as our final offer.  We still take an $800,000k loss and the buyer gets a deal, but we have already managed Senior Management's expectations to the $6 million figure and its just more 'cosmetically pleasing' to have that 6-hook on it.

(Opp., Ex. 2, p. 3.)

Later on September 9, 2010, Kerkay emailed Varsano, stating:

> . . thanks again Steve.  Just to clarify, Sharon is our CFO - not the contact at the potential buyer.  I had quick conversations about this with both Sharon and Praveen.  I'm going to go ahead and launch a call to the buyer and see if we could get a deal done at $6.0 million (Sharon is okay with this, but I'll need to get 'final approval' from our CEO).  I'll let you know what comes of that - we may yet have you come in as the 'bad cop' in this negotiation.

(Opp., Ex. 2, p. 4.)

[4]

In particular, MetroHealth asserts that the exchanged emails do not show that Daugherty "agreed to sell the helicopter for $6,000,000.00," noting that Jeff Kerkay's second email to Varsano on September 9th specifically states that Kerkay needed to obtain "final approval" from the hospital's CEO.  (Rep. at 4.)

9

In that MetroHealth did not move for summary judgment on the additional/alternative basis that MetroHealth officers did not agree to a $6 million sale, that basis will not be considered. Rather, the motion before the Court requires the Court only to determine whether MetroHealth is entitled to judgment as a matter of law on the gound that Ohio Rev. Code § 330.06(C) and Resolution 16015 constitute legislative requirements that MetroHealth's Board of Trustees approve a final sale of the hospital's helicopter through a board resolution.

The Court does not find MetroHealth entitled to summary judgment on this basis. MetroHealth cites cases establishing the general proposition that contracts entered into with governmental entities that do not comply with legislative requirements are null and void and that parties seeking to enter contracts with governmental entities are on constructive notice of statutory limitations on the power of the entity to contract. However, MetroHealth's position is not persuasive that legislative requirements require a board resolution here. First, as Atlantis points out, Ohio Rev. Code § 339.06(C) generally vests the Board of Trustees with "control" over the disposal of hospital property, but the statute does not state the manner in which the board must exercise its control or that the Board of Trustees itself must approve contracts for the sale of hospital property. In this regard, Ohio Rev. Code § 339.06(C) is distinguishable from the statutory provisions in the cases MetroHealth cites, which specifically identify an individual or body that must approve or ratify a contract with a governmental entity or set forth specific requirements that are necessary in order to obtain a valid contract with a governmental entity. *See, e.g., Shampton*, 98 Ohio St.3d at **459** (city charter stated that "no contracts . . . shall be legal until ratified or authorized by ordinance or resolution of the Council"); *Union Stockyards v. City of Hillsboro*, 191 Ohio App.3d 564,

567, 947 N.E.2d 183, 184 (Ohio App. 2010) (city council resolution stated that "[t]he Mayor is hereby authorized and directed to enter into a purchase agreement"); *City of Wellston v. Morgan*, 62 N.E.127 (Ohio 1901) (statute provided that "a municipality cannot enter into a contract, agreement, or obligation except by ordinance or resolution of its council"); *Buchanan Bridge Co. v. Campbell*, 60 Ohio St. 406, 54 N.E.372 (Ohio 1899) (addressing specific statutory requirements pertaining to the restructure of a bridge, including requirements for submission of plans, drawings, and work specifications; approval by specified city officials; public notice; and a procedure for the submission of vouchers for payment).

Ohio Rev. Code § 339.06(C)'s general vesting of the "entire management and control of the property of the county hospital" in the Board of Trustees is not specific legislation setting forth requirements pertaining to contract formation with the hospital. Accordingly, the Court does not find that Ohio Rev. Code § 339.06(C) constitutes statutory authority rendering an agreement to sell hospital property not specifically approved by the Board of Trustees null and void.

Further, MetroHealth's position that the phrase in Resolution 16015 that "[a]ny final sale will be subject to the approval of the System" requires the approval of the Board of Trustees is also unpersuasive. The language used by the Board of Trustees elsewhere in the resolution is inconsistent with MetroHealth's interpretation. When the Board of Trustees referred to itself in the resolution in three different places, it did not refer to itself as "the System"; rather, it referred to itself as "the Board of Trustees of The MetroHealth System" or simply as "the Board." *See* Resolution16015 ("WHEREAS, **the Board of Trustees of The**

11

**MetroHealth System** has been presented a recommendation for the retention of experienced intangible and personal property brokers"; "WHEREAS, **the Board's** Finance Committee has reviewed this recommendation and now recommends its approval;" "NOW, THEREFORE BE IT RESOLVED, **The Board of Trustees of the MetroHealth System** hereby approves the retention of experienced intangible and personal property brokers . . . .") (emphasis added.)  These three references show that the Board of Trustees chose to use the word "Board" when it referred to itself in the resolution and, therefore, did not intend to refer to itself as "the System."

The only other place in the resolution where the term "the System" is used (other than in the disputed phrase "[a]ny final sale will be subject to the approval of the System") is where the resolution refers to the property of MetroHealth itself.  *See id.* ("The Board of Trustees of the MetroHealth System hereby approves the retention of experienced . . . . brokers . . . for confidential solicitation of purchase proposals **for certain surplus intangible and other personal property of the System**") (emphasis added).  The use of the term "the System" in referring to hospital property also contradicts MetroHealth's position that "the System" refers to the hospital's Board of Trustees.

Finally, MetroHealth's interpretation of Resolution 16015 creates tension with a plain reading of the Sales Management Agreement.  Under MetroHealth's interpretation of Resolution 16015, all contracts would require final approval of the hospital Board of Trustees, even an agreement to sell the hospital's helicopter for MetroHealth's asking price of $6.5 million.  However, the Sales Management Agreement clearly provides that Atlantis "shall receive a commission of $150,000.00" if MetroHealth receives its initial asking price of $6.5

12

million; no approval or authorization is required in order for Atlantis to receive a commission in that instance.  This further suggests that the phrase "[a]ny final sale will be subject to the approval of the System") was not intended to require approval of the Board of Trustees.

**Conclusion**

In sum, for all of the reasons discussed above, MetroHealth has not persuasively demonstrated that Ohio Rev. Code § 339.06(C) and Resolution 16015 preclude the formation of a valid contract to sell the hospital's helicopter for $6 million without formal approval of the hospital's Board of Trustees.  Accordingly, MetroHealth's motion, seeking summary judgment on the basis that statutory requirements governing contract formation with the hospital were not followed in this case, is denied.

IT IS SO ORDERED.


                                       /s/ Patricia A. Gaughan
                                       PATRICIA A. GAUGHAN
                                       United States District Judge

Dated: 10/19/11