**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Atlantis 2000 Group, Inc.,** | ) | **CASE NO. 11 CV 58** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **The MetroHealth System, Inc.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

This contract dispute involves a sales management agreement. Pending before the Court are the parties' cross motions for summary judgment: Motion of Defendant The MetroHealth System, Inc. for Summary Judgment (Doc. 49) and Motion for Summary Judgment of Plaintiff Atlantis 2000 Group, Inc. (Doc. 50).[1] For the reasons stated below, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

**Facts**

---

[1] A prior motion for summary judgment by the defendant directed to a prior complaint was previously denied by the Court. (*See* Doc. 43.)

1

Defendant MetroHealth System, Inc. (MetroHealth) is a county hospital organized and operated under Chapter 339 of the Ohio Revised Code.  In 2010, MetroHealth's Chief Executive Officer, Mark Moran, decided to undertake to sell a surplus Eurocopter EC145 helicopter owned by MetroHealth.  (Moran Dep. at 12.)  Moran directed Jeff Kerkay, MetroHealth's Treasurer, and Sharon Daugherty (now Sharon Kelley), MetroHealth's Chief Financial Officer, to determine if the helicopter could be sold.  (*Id.*)  Kerkay obtained the name of Steve Varsano, owner of Plaintiff Atlantis 2000 Group, Inc. (Atlantis), as a potential broker for the helicopter.  (Kerkay Dep. at 12).  Kelley and Moran decided to hire Atlantis to broker the sale of the helicopter.  (Kelley Dep. at 19; Moran Dep. at 12.)

MetroHealth could not sell its helicopter without the approval of MetroHealth's Board of Trustees.  A recommendation was made to the Board of Trustees to retain a broker to sell the helicopter.  On May 26, 2010, MetroHealth's Board of Trustees adopted Resolution 16015, which provides:

> WHEREAS, the Board of Trustees of The MetroHealth System has been presented a recommendation for the retention of experienced intangible and personal property brokers through competitive bidding or a statutory equivalent; and
>
> WHEREAS, the Board's Finance Committee has reviewed this recommendation and now recommends its approval.
>
> NOW, THEREFORE BE IT RESOLVED, The Board of Trustees of the MetroHealth System hereby approves the retention of experienced intangible and personal property brokers through competitive bidding or a statutory equivalent, for confidential solicitation of purchase proposals for certain surplus intangible and other personal property of the System.  The retained broker may use any commercially reasonable and confidential method to solicit purchase proposals.  **Any final sale will be subject to the approval of the System.**  All brokerage fees and expenses are to be paid out of either the proceeds of any final sale or general operating funds.

>BE IT FURTHER RESOLVED, The Chief Executive Officer and President or designee are hereby authorized to negotiate and execute agreements and other documents consistent with this resolution.

(Def. Mot., Ex. A.) (emphasis added.)

On July 13, 2010, pursuant to Resolution 16015, MetroHealth entered into a Sales Management Agreement with Atlantis for the promotion and sale of the surplus helicopter. The Sales Management Agreement stated:

>Atlantis agrees to undertake a professional promotional effort directed toward the sale of MetroHealth's Helicopter. Atlantis's marketing and sales specialists will provide exposure through circulation of information and details regarding the Helicopter to its international network of contacts, directly to owners and operators of TRADE-UP aircraft, or helicopters and other advertising methods as Atlantis deems desirable. Atlantis shall pay the costs of all such marketing and advertising activities. In consideration of the above undertaking by Atlantis, MetroHealth agrees that Atlantis shall have the exclusive right to manage the sale, trade and/or lease of the Helicopter for a period of up to 6 (six) months.

>MetroHealth agrees to Atlantis initially listing the aircraft for sale at an asking price of US $6,500,000 (six million five hundred thousand dollars). **MetroHealth agrees that if it receives this price or, in the event it later authorizes a sale at less than that amount authorized above**, **Atlantis shall receive a commission of $150,000.00 (one hundred fifty thousand dollars) in cash from the closing escrow funds**.

>MetroHealth agrees to assist Atlantis by making available for review by prospective purchasers all documents establishing MetroHealth's ownership of, and the authority to sell and transfer title to, the helicopter.

>MetroHealth understands that Atlantis will be incurring substantial time and expenses to market and advertise the aircraft and agrees to refer all inquiries to them or their operator concerning the sale of the helicopter to Atlantis during the term of the Agreement. In addition, if MetroHealth directly or indirectly sells, trades and/or leases the helicopter during the period of this agreement to any third party, or 180 days after this agreement expires . . . then MetroHealth agrees to pay Atlantis the $150,000.00 commission above.

>MetroHealth reserves the right to terminate this agreement for cause with 10 days notice to Atlantis.

3

(Emphasis added.)

The Sales Management Agreement was executed on behalf of MetroHealth by Sharon Kelley in her capacity as CFO and on behalf of Atlantis by Varsano.

Varsano subsequently communicated with Kerkay regarding the helicopter and the efforts to market and sell it. On September 9, 2010, MetroHealth received an offer from the Children's Hospital of New Orleans to purchase the helicopter for $6,000,000.00. Kerkay informed Varsano that MetroHealth received this offer in a September 9, 2010 email. Kerkay informed Varsano that MetroHealth had received "a credible (but low-ish) offer." In subsequent emails the same day, Kerkay and Varsano communicated about the received offer and market conditions. Kerkay indicated to Varsano that he had "already managed Senior Management's expectations to the $6 million figure." Kerkay also told Varsano that Sharon Kelley was "okay" with a $6 million deal. (Atlantis Ex. 3.) However, Kerkay stated in the same email to Varsano that he would "need to get 'final approval' from [MetroHealth's] CEO."

In a September 10, 2010 email, Kerkay reiterated: "the buyer can get to $ 6 million. Sharon is okay with this, but I'm going to put together a quick note to the CEO. Is it your opinion Steve that we should accept this deal . . . ?" Varsano responded on September 10, 2010, stating that it was his opinion that the "transaction should be accepted." Specifically, Varsano stated that he was

> happy to continue to market the helicopter if that is your decision and try to find someone who would pay more, but realistically thinking, cost of money, the surety of a deal now, not having to worry about storage costs, insurance costs and ground maintenance up keep, it is my opinion that this transaction should be accepted. Please let me know how you want to proceed and how

4

you want me to lead this deal through to a closing.

Kerkay sent additional emails to Varsano on September 10, 2010 and September 13, 2010. On September 13, 2010, Kerkay told Varsano: "We're still working on a 'yea' or 'nea' from our CEO - our Life Flight operator asked for a change to the operating agreement at the end of last week, so we're quickly assessing another scenario in which we would take possession of the third [i.e., surplus] EC-145 and give back the EC-145 that we are currently leasing/renting. I don't see how the latter is going to work, so my guess is that we will yet sell – I've asked Children's NOLA to give us until next week to decide on their offer . . . "

On September 16, 2010, Kerkay told Varsano: "We'll have a go/ no- go decision tomorrow - thanks . . . " On September 20, 2010, Kerkay stated in an email: "sorry - we didn't get a chance to speak to our CFO about this until late in the day on Friday. She is speaking to our CEO and the department today."

On September 21, 2010, Kerkay sent Varsano an email informing Versano that MetroHealth ultimately decided not to sell the helicopter. Kerkay stated:

> We decided to put out third EC-145 into operation rather than sell it. Interesting that we were a likely seller at $6.25 million (certainly at $6.50 million) but not at $6.00 million, but I think the potential of our CEO having to take a [approximately] $800k capital loss to the Board was enough to cause finance and operations to rethink our strategy here.
>
> As such, I wouldn't spend any more time actively marketing the aircraft. Certainly, if you receive any more interest from potential buyers please pass it along, but now that it is being placed in operations it will be difficult to extract it for a sale without an extremely rich offer I should think. Thanks for all of your expertise, feedback, and patience as we worked through this situation.

Varsano responded:

> I am a bit shocked at MetroHealth's decision not to sell the Eurocopter supposedly because of the price offered, especially when EVERYONE in your

> organization knew well in advance and was acknowledged by you in your e-mail that $6,000,000 would be acceptable. However, I am more surprised and disappointed how you handled the decision and by your refusal to respond to my phone calls and messages. . . . Be it as it may, we had an agreement to find a buyer for the helicopter. A buyer was acceptable. They agreed to pay $6,000,000. In your previous e-mails you agreed this would be acceptable. The market in fact i[s] far less than this amount. . . . I'm sorry to say, I've done the job I was contracted to do. MetroHealth's decision to reverse course is certainly up to them. However, the fee we agreed to is still due as I held up my side of the agreement. Please find attached the invoice per the agreement with wiring instructions included.

Kerkay subsequently sent Varsano an email suggesting that he and Versano "talk at some point." Kerkay also stated that he thought MetroHealth "could probably see clear to modifying the contract to get you [Varsano] some sort of 'time & materials not to exceed' fee language inserted" into the Sales Management Agreement.

> Varsano responded as follows:

> I'll make myself available anytime to speak with you about this. Regarding your e-mail below, please remember that on June 16th, WELL IN ADVANCE of finalizing the agreement between us, you stated that $6 million was the figure your company realistically expected to receive. You never said anything about the CEO not being in agreement with this. This was the basis for moving forward. In all my communications we had between us, I always stated that you would be lucky to achieve $6 million as it was a special designed medivac helicopter and we would need to find that one specific buyer looking for such a helicopter or someone would have to calculate the costs to refurbish it to a more normal executive interior which would make the selling price even lower to absorb these refurb costs. I believe the price is not really the reason for not going forward as your CFO was clearly okay with this price. It seems you received a last minute operating proposal that was clearly a better direction and outcome for your company in addition to not having to show ANY loss on the financial statements. [W]hatever the reason shouldn't be of my concern, however, in this case it is since my compensation is directly effected. I look forward to speaking with you.

On October 26, 2010, Kerkay sent Varsano another email, apologizing for his delay in responding and stating that MetroHealth would offer to pay Varsano his actual expenses

6

(approximately $15,000) in his efforts to market the helicopter.  Kerkay stated that if Varsano chose to accept the offer, MetroHealth would need him to execute a release and submit his itemized expenses.  Varsano responded that he found the offer insulting.

Atlantis subsequently initiated this lawsuit against MetroHealth.  Atlantis' First Amended Complaint alleges the following claims for relief:  (1) Breach of Contract; (2) Bad Faith and Breach of the Express and/or Implied Covenants of Good Faith and Fair Dealing; (3) Negligent and/or Intentional Misrepresentation; (4) Quantum Meruit and/or Quantum Valabant; (5) Detrimental Reliance; and (6) a claim for Compensatory and Punitive Damages.[2]

Atlantis moves for summary judgment in its favor on its breach of contract claim; MetroHealth moves for summary judgment on all of Atlantis' alleged claims.

**Standard of Review**

Federal Rule of Civil Procedure 56 governs summary judgment and provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled judgment as a matter of law."  The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion."  This can be done by citation to "materials in the record," including depositions, documents, affidavits, stipulations, and electronically stored information.  Fed. R. Civ. P. 56(c)(1)(A).  Rule 56(c)(1)(B) allows a party to "show[]

---

[2] On April 30, 2012, the Court granted Atlantis' unopposed motion to file the First Amended Complaint (Doc. 45).  Although Atlantis did not subsequently separately file the First Amended Complaint, MetroHealth answered the First Amended Complaint that was attached to Atlantis' motion for leave.  (*See* Doc. 48.)

7

that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1986). In order to defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its position. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). In determining a motion for summary judgment, the non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255.

**Discussion**

*Breach of Contract*

In order to prove a breach of contract claim under Ohio law, a plaintiff must prove that: (1) a contract existed; (2) the plaintiff fulfilled its obligations under the contract; (3) the defendant failed to fulfill its obligations; and (4) damages resulted from defendant's breach. *Lawrence v. Lorain County Community College*, 127 Ohio App.3d 546, 549 (Ohio App. 1998).

Atlantis contends it is entitled to summary judgment on its claim that MetroHealth breached the parties' Sales Management Agreement because "[n]o dispute exists that Atlantis entered into a contract with MetroHealth under which Atlantis was given the exclusive right

8

to market and sell the subject helicopter for up to six months and that Atlantis performed its obligations under the contract." (Atl. Mem. at 7.) Atlantis contends there is no dispute that it performed its obligations because "Children's Hospital of New Orleans offered to purchase the helicopter for $6" and this figure "was acceptable to both MetroHealth's CFO and Treasurer." To support this, Atlantis relies on evidence, primarily the communications between Kerkay and Varsano, indicating that both Kerkay and Kelley found the $6 million figure acceptable for the sale of the helicopter. Atlantis argues that MetroHealth's "expectations" were met by the $6 million offer and MetroHealth breached the agreement by rejecting the "acceptable offer." In addition, Atlantis contends that MetroHealth breached its contractual obligations by "placing the helicopter in service during the six month period of the Agreement." (*Id*. at 8.) According to Atlantis, MetroHealth's placing the helicopter back into service made "it undeniably clear" that MetroHealth would not accept an offer under $6.5 million OR a $6.5 million offer for the helicopter and, in effect, terminated the Sales Management Agreement without cause. (Atl. Mem. at 7-8.)

MetroHealth opposes Atlantis' motion for summary judgment and moves for summary judgment in its favor on Atlantis' breach of contract claim, maintaining that MetroHealth had no legal obligation to pay Atlantis a commission. MetroHealth argues (as it did in its previous summary judgment motion) that Atlantis' breach of contract claim fails because MetroHealth's Board of Trustees never approved a sale of the helicopter through a board resolution.[3] MetroHealth further argues that, even if the Board of Trustees had delegated

---

3

     As the Court noted in its previous Memorandum of Opinion and Order addressing MetroHealth's prior summary judgment motion, MetroHealth's Board of Trustees did not issue a resolution approving a sale of the helicopter subsequent to Resolution 16015.

9

authority to officers and employees to authorize a sale, "there is no proof that the offer to buy the helicopter was ever accepted by any officer or employee of Defendant." Rather, MetroHealth contends the evidence shows that "an offer was received and Defendant determined that it was not an acceptable offer." Hence, a sale for less than $6.5. million was not authorized and no commission was due under the terms of the Sales Management Agreement. (Met. Mem. at 9.)

Atlantis disputes that MetroHealth is entitled to summary judgment. Atlantis disputes MetroHealth's position that a resolution by MetroHealth's Board of Trustees was required in order for MetroHealth to approve a final sale of the helicopter, arguing that the language of Resolution 16015 and testimony given in the case create at least an issue of fact as to "whether the Board of Trustees delegated authority to effectuate the sale of the Helicopter to Hospital personnel." (Atl. Opp. at 10-12.) In addition, Atlantis takes the position in its opposition to MetroHealth's motion (as it did in support of its own motion for summary judgment) that MetroHealth officers and employees found the $6 million offer "acceptable." Atlantis emphasizes that Kerkay repeatedly represented to Varsano that $6 million was all MetroHealth expected to obtain for the sale of the helicopter and asserts that the $6 million figure was the basis for Atlantis "moving forward with the Sales Management Agreement" in the first place. (Atl. Opp. at 6.)[4] Atlantis also argues in its opposition brief that, at the least, a

---

The Court denied MetroHealh's previous motion seeking summary judgment on this asserted basis that MetroHealth could not be held liable on Atlantis' claims as a matter of Ohio law because MetroHealth's Board of Trustees never approved a $6 million offer through board resolution.

[4]

Atlantis asserts: "From the outset of the parties' relationship, the parties knew that MetroHealth would be 'lucky' to achieve a sale for $6 million." (Atl. Opp. at 5.)

10

question of fact exists as to whether the sale of the helicopter for $6 million was approved by MetroHealth. Atlantis relies on the evidence showing that Kerkay and MetroHealth's CFO, Kelley, were both amenable to a sale for $6 million. Atlantis asserts that "a reasonable juror could conclude that Ms. Kelley was the individual who had authority to proceed with a sale." (*See* Atl. Opp. at 13-14.)

MetroHealth's motion for summary judgment on Atlantis' breach of contract claim is persuasive and granted and Atlantis' motion for summary judgment on the claim is denied. The Sales Management Agreement on its face unambiguously provides that Atlantis was entitled to a $150,000.00 sales commission if MetroHealth received an offer to buy its helicopter for MetroHealth's initial asking price of $6.5 million during the contract (6 month) period. There is no dispute that a $6.5 million offer was not obtained.

The Sales Management Agreement further unambiguously provides that Atlantis was entitled to a commission for a sale at less than the authorized $6.5 million asking price only "in the event [that MetroHealth] later authorize[d] a sale at less than [the $6.5 million price]." MetroHealth's argument is persuasive that the email communications set out above between Kerkay and Varsano show that MetroHealth did not authorize a sale of its helicopter at the offered $6 million price but, instead, decided not to sell the helicopter for the $6 million offered but to put the helicopter back into service because it did not want to take an $800,000 capital loss. Specifically, the email communications between Kerkay and Varsano show that both Kerkay and Varsano understood that the $6 million transaction had to be approved by MetroHealth's CEO. Beginning on September 9, 2010 (when Kerkay first informed Varsano of the $6 million offer MetroHealth received), Kerkay repeatedly told Varsano in subsequent

11

emails that he (Kerkay) had to get the approval for the $6 million offer from the CEO. On September 9, 2010, Kerkay informed Varsano of the offer and expressly stated he "need[ed] to get 'final approval' from our CEO." On September 10, 2010, Kerkay informed Varsano that Kelley was okay with the deal at $6 million but that he was "going to put together a quick note to the CEO" and asked Varsano's opinion as to whether MetroHealth should "accept" the $6 million deal. Varsano's response, stating Varsano's opinion that the transaction "should be accepted" but that Varsano would be happy to continue to market the helicopter if MetroHealth decided that it wanted to "try to find someone who would pay more," indicates that Varsano himself understood that a sale at $6 million was not authorized at this point.

Subsequent emails from Kerkay also clearly informed Varsano that the CEO's approval was being sought and that MetroHealth had not accepted the New Orleans Children's hospital's offer to buy the helicopter for $6 million. MetroHealth ultimately did not accept the New Orleans Children's hospital's offer and informed Varsano on September 21, 2010 of this decision. In sum, even assuming that MetroHealth's Board of Trustees delegated authority to approve a sale to officers or employees of the hospital, the email correspondence between Kerkay and Varsano demonstrates that the $6 million offer was not authorized by MetroHealth such that Atlantis had a contractual right to receive a commission under the terms of the parties' agreement. Atlantis' argument that a reasonable juror could find Kelley's approval sufficient is unpersuasive in light of the emails exchanged between Kerkay and Varsano clearly indicating that the CEO's approval was necessary.

Atlantis argues that everyone involved knew from the start of the parties' relationship that a $6.5 million offer was not obtainable in the market and that MetroHealth realistically

only "expected" $6 million for the helicopter. Atlantis stresses that Kerkay communicated this expectation to Varsano, including stating to Varsano that he had "managed Senior Management's expectations to the $6 million figure." However, even if this is true and the parties only realistically expected to be able to procure $6 million for the helicopter, the parties did not *agree* in their Sales Management Agreement that Atlantis would receive a commission if MetroHealth received a $6 million, or some other "realistic," offer. Rather, the parties contractually agreed that MetroHealth would pay Atlantis a commission if MetroHealth received its asking price of $6.5 million or if MetroHealth "later authorize[d] a sale at less than [the asking price]." As discussed above, MetroHealth did not authorize a sale for $6 million. Thus, none of the circumstances under which Atlantis would receive a commission agreed to by the parties occurred.[5] Accordingly, Atlantis does not have a contractual right under the Sales Management Agreement to receive a commission.

Atlantis' alternative argument that MetroHealth breached the Sales Management Agreement by putting the helicopter back into service prior to the expiration of the six month period in which Atlantis was granted the exclusive contractual right to manage the sale, trade, or lease of the helicopter is also unpersuasive. Simply, there was no obligation under the Sales Management Agreement that MetroHealth keep the helicopter out of service. Atlantis argues that MetroHealth's conduct in putting the helicopter back into service made it clear that MetroHealth would not sell the helicopter within the contract period at any price and,

---

[5] The Sales Management Agreement also provided that Atlantis would receive a commission "if MetroHealth directly or indirectly sells, trades and/or leases the helicopter during the period of this agreement to any third party, or 180 days after this agreement expires." There is no evidence or argument that this occurred.

13

thus, effectively terminated the agreement "without cause."  But Atlantis cites no authority supporting its position that MetroHealth's conduct constituted a termination of the Sales Management Agreement.  In fact, under the terms of the Sales Management Agreement, if MetroHealth received an offer for $6.5 or otherwise sold, traded, or leased the helicopter within the six month period, it would have been obligated to pay Atlantis a commission.

In sum, for all of the reasons stated above, Atlantis has not persuasively demonstrated that MetroHealth breached any term of the Sales Management Agreement.  MetroHealth, on the other hand, has persuasively demonstrated that Atlantis is not entitled to a commission under the plain and unambiguous terms of the Agreement.

Accordingly, Atlantis' motion for summary judgment on the breach of contract claim denied and MetroHealth's motion for summary judgment on the contract claim is granted.

*Bad Faith and Breach of Express And/Or Implied Covenants of Good Faith and Fair Dealing*

Apart from its breach of contract claim, Atlantis alleges a separate cause of action against MetroHealth for "bad faith and breach of express and/or implied covenants of good faith and fair dealing."  Atlantis alleges that MetroHealth acted in bad faith and breached express and/or implied covenants of good faith and fair dealing by:  (1) purporting to rely on a non-contractual term to avoid its obligations to Atlantis; (2) purportedly terminating the sales management agreement without cause; (3) failing to present the $6 million offer for the helicopter to MetroHealth's Board of Trustees; and (4) putting the helicopter back into service while the sales management agreement was still in effect.  (First Am. Complt. ¶ 9.)

MetroHealth moves for summary judgment on this claim on the basis that the claim is not actionable under Ohio law and that MetroHealth did not act in bad faith in any case.

14

Atlantis does not address MetroHealth's argument that the "bad faith" claim is not actionable under Ohio law.

MetroHealth's motion for summary judgment on Atlantis' bad faith claim is granted. As the Ohio courts have held, "[s]ince the duty of good faith and fair dealing is integral to any contract [under Ohio law], the breach of that duty is . . . integral to a cause of action for breach of contract." *Ireton v. JTD Realty Investments, LLC*, 162 Ohio Misc.2d 1, 22 (Clermont Cty. 2010). "Therefore, in Ohio, outside of the context of insurance contracts, the breach of the duty of good faith does not exist as a separate cause of action from a breach of contract claim." *Id*. That is, an allegation of a breach of a covenant of good faith and fair dealing "cannot stand alone as a separate cause of action from a breach of contract claim." *Id*. Further, where a breach of contract claim is dismissed on summary judgment, "the claim of breach of duty of good faith and fair dealing cannot stand alone as a separate cause of action." *Id*.

In that Atlantis has not demonstrated that MetroHealth breached any provision of the Sales Management Agreement, Atlantis does not have a separate, cognizable claim for "bad faith and breach of express and/or implied covenants of good faith and fair dealing" under Ohio law.

*Negligent and/or Intentional Misrepresentation*

MetroHealth next moves for summary judgment on Atlantis' claim for "negligent and/or intentional misrepresentation." Atlantis alleges that MetroHealth's acts

> constitute negligent and/or intentional misrepresentation in Defendant's contractual dealings with Plaintiff including, but not limited to, representing that Defendant had authority and legal ability to conjugate an agreement for the sale of the subject Helicopter to a buyer procured by Plaintiff pursuant to

15

> its attached Sales Management Agreement with Defendant when Defendant
> knew and/or should have known that Ohio law may prevent the sale of the
> subject Helicopter by Defendant to any buyer procured by Plaintiff pursuant to
> the parties' written Sales Management Agreement . . . .

(First Am. Complt. ¶ 10.) Although these allegations are unclear, Atlantis' misrepresentation claim appears to be (judging from the arguments Atlantis makes in its opposition brief) that Kerkay negligently and/or intentionally represented to Varsano that Atlantis would receive a commission if MetroHealth received an offer for $6 million for the helicopter but MetroHealth subsequently declined to accept a $6 million offer for the helicopter for reasons other than price. (*See* Atl. Opp. at 19-20.)

MetroHealth's motion for summary judgment on Atlantis' misrepresentation claim is granted. Although MetroHealth does not specifically articulate this argument in its motion for summary judgment, in order to make out a negligent or intentional misrepresentation claim under Ohio, the plaintiff must demonstrate that it reasonably relied on the defendant's alleged misrepresentation. *See Andersons, Inc. v. Consol. Inc.*, 348 F.3d 496, 505 (6th Cir. 2003). As discussed above in connection with Atlantis' breach of contract claim, MetroHealth has persuasively demonstrated that the plain and unambiguous language of the Sales Management Agreement provided that Atlantis would be entitled to a commission if (1) a $6.5 million offer was obtained; or (2) MetroHealth later authorized a sale at a lower price. Given these express contractual provisions stating the circumstances under which Atlantis would be entitled to receive a commission, any reliance by Varsano on representations made by Kerkay that Atlantis would receive a commission if a $6 million offer were obtained – made outside of the parties' written agreement – would not be reasonable. Likewise, Atlantis could not have reasonably relied on any representation by MetroHealth as to the sale of the

helicopter not being "financially feasible" for $6 million. Simply, MetroHealth was not required under the Sales Management Agreement to give Atlantis any explanation for authorizing or declining to authorize a sale. Under the Sales Management Agreement, MetroHealth was able to decline to authorize a sale under $6.5 million for any reason. Thus, it would not be reasonable for Atlantis to "rely" in any way on a statement or representation by MetroHealth that a sale at $6 million was not financially feasible.

In that no reasonable jury could conclude that Atlantis reasonably relied on the alleged misrepresentations on which Atlantis relies, Atlantis' claim for negligent and/or intentional misrepresentation fails as a matter of law.

*Quantum Meruit/Quantum Valabant and Detrimental Reliance*

"Concurrently and/or in the alternative" to its other claims, Atlantis alleges in its First Amended Complaint that it "has devoted substantial effort and incurred significant costs in furtherance of the promotion and sale of the Defendant's aforedescribed Helicopter to Plaintiff's financial damage and detriment and for which Plaintiff has a claim against Defendant on the theories of *quantum meruit* and/or *quantum valabant*." (First Am. Complt., ¶11.) In addition, Atlantis alleges a claim for "detrimental reliance." (*Id.*, ¶12.) ("Concurrently and/or in the alternative, Plaintiff relied to its financial damage and detriment upon Defendant's promises and commitments with respect to the promotion and sale of Defendant's helicopter and for which Plaintiff has a claim against Defendant in equity.")

MetroHealth argues that Atlantis has no right to recover under these equitable theories because an express contract (the Sales Management Agreement) existed and specified the conditions under which Atlantis was entitled to a commission (which were not satisfied here).

17

MetroHealth cites *Pawlus v. Bartrug*, 109 Ohio App.3d 796, 800 (Ohio App. 1996), in which the Ohio Court of Appeals held that the equitable doctrines of unjust enrichment and *quantum meruit* "are inapplicable if an express agreement existed concerning the services for which compensation is sought; the parameters of the agreement limit the parties' recovery, in the absence of bad faith, fraud or illegality." *Id.*

MetroHealth's argument is persuasive. Atlantis asserts in its opposition brief that "MetroHealth simply cannot avoid liability . . . by summarily asserting that it was not at fault, nor did it engage in bad faith or fraud, when it refused to sell the Helicopter at the expected price." (Atl. Opp. at 22.) However, Atlantis does not and cannot dispute the dispositive fact that a valid contract, the Sales Management Agreement, governed the parties' relationship and the circumstances under which Atlantis would be paid. Because an express contract exists and governs the subject matter of the parties' dispute, "the terms and parameters of that express agreement define the parties' liability," and "quasi" contract theories are not applicable as a matter of law. *See Pawlus*, 109 Ohio App. 3d at 800. There was no provision made in the Sales Management Agreement for Atlantis to recover its expenses or costs in the event a sale of the helicopter was not achieved.

Accordingly, MetroHealth's motion for summary judgment on Atlantis' equitable, quasi-contractual claims is granted.

*Compensatory and Punitive Damages*

This leaves Atlantis' stand alone cause of action for "compensatory and punitive damages." Atlantis alleges that it is entitled to compensatory and punitive damages as a

direct and proximate result of MetroHealth's "aforedescribed wrongful acts." (First Amended Complt., ¶ 13.) As discussed above, Atlantis has failed to demonstrate a viable basis for any of its claims on summary judgment. Therefore, there is no basis for Atlantis to recover compensatory and/or punitive damages. MetroHealth's motion for summary judgment on Atlantis' cause of action for compensatory and punitive damages is granted.

**Conclusion**

For all of the reasons stated above, MetroHealth's motion for summary judgment on all of Atlantis' claims (Doc. 49) is granted, and Atlantis' motion for summary judgment on its breach of contract claim (Doc. 50) is denied.

IT IS SO ORDERED.

        /s/ Patricia A. Gaughan
        PATRICIA A. GAUGHAN
        United States District Judge

Dated: 6/28/12